1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                          EASTERN DISTRICT OF CALIFORNIA

10

11   DONNA GREEN and NELSON                    No. 2:13-cv-00949-TLN-KJN
     DECUIRE, individually and as successors-
12   in-interest for Decedent JACOB MOSES
     GREEN,
13                                             **MEMORANDUM AND ORDER**
                 Plaintiffs,
14
           v.
15
     COUNTY OF SACRAMENTO; DANNY
16   PAUL OLIVER, individually and in his
     official capacity as a deputy sheriff for the
17   County of Sacramento; PAUL FLICK,
     individually and in his official capacity as a
18   deputy sheriff for the County of
     Sacramento; PABLITO GADDIS,
19   individually and in his official capacity as a
     deputy sheriff for the County of
20   Sacramento; TIMOTHY PAI, individually
     and in his official capacity as a deputy
21   sheriff for the County of Sacramento; and
     ERIC HENDERSON, an individual, DOES
22   5-50, inclusive,

23               Defendants.

24

25          The matter is before the Court on Plaintiffs Donna Green and Nelson Decuire's motion for

26   summary judgment (ECF No. 27), and Defendants Deputy Danny Paul Oliver,[1] Deputy Paul

27   Flick, Deputy Pablito Gaddis, Deputy Timothy Pai (collective "Defendant Officers"), Defendant

28   _____
     [1] Subsequent to the filing of this action, Deputy Oliver was killed in the line of duty.  (ECF No. 25.)

                                                1

Eric Henderson ("Defendant Henderson"), and County of Sacramento's (the "County") (collectively "Defendants") motion for summary judgment (ECF No. 29).  The Court has carefully considered the parties' briefing and submitted evidence.  For the reasons stated below, Defendants' motion for summary judgment is GRANTED, and Plaintiffs' motion for summary judgment is DENIED.

## I.  FACTS

This case involves a shooting that occurred in the early morning of April 25, 2012, resulting in the death of Jacob Green ("Green").  This action is brought by Green's parents.

According to Plaintiffs, the shooting occurred because Defendant Henderson, Green, and others got into a verbal dispute at the residence of Henderson's girlfriend, located on Karm Way in Citrus Heights (the "Citrus Heights residence").  Green arrived at the residence at about 3:00 AM, to talk to his own girlfriend who was staying at the residence.  Green's girlfriend indicated her desire to talk to Green.  Henderson's girlfriend and Henderson began to argue with Green and told him to leave.  Henderson eventually shot Green.  Subsequently, Green's friends and/or relatives transferred him to a white Cadillac (the "vehicle") and left for the hospital.[2]  (First Amended Complaint, "FAC", ECF No. 16 at 4–6.)

A.  Undisputed Material Facts

On April 25, 2012, shortly after 3:00 AM, the Sacramento Sherriff's Department ("SSD") radio dispatch reported that a "245" (California Penal Code § 245, Assault with a Deadly Weapon) occurred at the Citrus Heights residence.  Dispatch reported: "Looks like the R/P [reporting person] Eric Henderson shot the intruder."  (Pl.'s SUF ¶ 1; SSD Radio Communications, ECF No. 32-7, Ex. 12 at 2:9–14.)

Thereafter, dispatch reported: "And we're getting a call from a male saying he needs an ambulance.  His brother has been shot … Black male yelling that the vehicle is pulling up now.

[2] In the instant briefing, Defendants do not dispute the FAC's recitation of the events leading up to the shooting. Both parties' statements of undisputed facts begin with the report to the Sacramento County Sherriff's Department after the shooting occurred.  The Court refers to Plaintiffs' Statement of Undisputed Facts (Pl.'s SUF, ECF No. 27-1) and Defendants' Response (Def.'s Resp., ECF No. 32-1); and Defendants' Statement of Undisputed Facts (Def.'s SUF, ECF No. 29-2) and Plaintiffs' Response (Pl.'s Resp., ECF No. 33-1).

Victim is outside at the end of the driveway."  (ECF No. 32-7, Ex. 12 at 2:20–24.)

Thereafter, dispatch reported: "And units responding, looks like subject's in a white Cadillac, loaded up the victim into a vehicle."  Dispatch reported: "Units responding, the male refused his name.  Says suspect is a black male, 18, shorts, leaving on Karm towards Andrea. CHP has been advised."  (ECF No. 32-7, Ex. 12 at 3:2–21.)

Thereafter, non-party Officer Harrington radioed over SSD: "12 Adam.  The white Cadillac is GOA.  As I pulled up,[3] they were leaving with the sus – or the victim inside."  An unknown officer then radioed over SSD: "Confirming, the suspect vehicle supposed to be a white Cadillac [unintelligible]?  Was 12 Adam with them?"  Dispatch responded: "12 Adam saw them as he was arriving.  And units, now they're saying that the victim is the one in the white Cadillac."[4]  (ECF No. 32-7, Ex. 12 at 5:6–24.)

Defendant Officers pursued the vehicle, which was headed eastbound on Greenback Lane at speeds ranging between 60–85 m.p.h.  Defendant Officers Gaddis, Flick, and Oliver had their Code 3[5] lights and sirens activated during the pursuit.  The posted speed limit on Greenback Lane was 45 m.p.h.  The nearest hospital, Mercy San Juan, was located generally southeast of the vehicle, approximately two miles away.  The vehicle ran red stop lights.  (Pl.'s SUF ¶¶ 7, 10–11; Def.'s Resp. ¶¶ 7, 10–11; Def.'s SUF ¶¶ 19–28; Pl.'s Resp. ¶¶ 19–28.)

The officers initiated the stop of the vehicle, via their lights and sirens.  After continuing to drive approximately three-quarters of a mile to a mile, the vehicle pulled over and stopped at

---

[3] Officer Harrington refers to pulling up to the Citrus Heights residence.  The in-board camera from Harrington's patrol vehicle shows him pulling up behind the vehicle at or near (what the Court infers) is the Citrus Heights residence where the shooting occurred, at about 3:10:05 AM.  Harrington yells "An ambulance is coming" and appears to attempt to get the vehicle to stay put.  Unknown individuals off to the side yell at the vehicle to drive away.  About 15 seconds after Harrington arrived, the vehicle leaves and Officer Harrington returns to his vehicle. He does not act in a manner that indicates he thinks a criminal suspect is fleeing the scene.  Harrington does not pursue the vehicle.

[4] In summary, SSD radio dispatch reported that a "suspect" or a "victim" was in the vehicle, with later reports confirming that the "victim" was in the vehicle.  It is undisputed that the officers in pursuit, by the time the vehicle was pulled over, had received multiple reports that the shooting victim was in the vehicle.

[5] Per the attached SSD General Order, Code 3 "designates emergency assignments calling for all practical haste, and authorizes officers to operate the sheriff's vehicle with red light and siren activated at all times as a warning to other drivers and pedestrians."  (ECF No. 32-6 at 2.)

3

about 3:12 AM.  (Pl.'s SUF ¶ 9; Def.'s Resp. ¶ 9; Def.'s SUF ¶ 29; Pl.'s Resp. ¶ 29.)  At that point, the officers had not confirmed where on his body the victim had been shot, or his condition.  (Def.'s SUF ¶¶ 39, 40; Pl.'s Resp. ¶¶ 39, 40.)

The officers performed a felony vehicle stop, which involved ordering the occupants out of the vehicle one-by-one, to walk backwards toward the patrol vehicles with their hands raised.  The officer first ordered the driver and then the front passenger out of the vehicle; those individuals were handcuffed and detained in a patrol vehicle.  (Pl.'s SUF ¶ 12; Def.'s Resp. ¶ 12; Def.'s SUF ¶¶ 46–47; Pl.'s Resp. ¶¶ 46–47.)

At some point, the driver reported that one of the occupants was shot.  Officer Pai radioed to dispatch: "Per the driver, someone in the vehicle has been shot."  As the front passenger exited the vehicle, Officer Pai radioed dispatch to request fire department paramedics to the location of the vehicle.  (Pl.'s SUF ¶¶ 16;Def.'s Resp. ¶ 16; Def.'s SUF ¶ 48; Pl.'s Resp. ¶ 48.)

At some point after the vehicle had stopped, officer Harrington radioed over SSD: "According to witness here, the shooter is at 5212 Karm, but he's still inside."  (ECF No. 32-7, Ex. 12 at 7:18–21.)

The officers ordered the right rear passenger to exit the vehicle; the passenger put his hands out of the vehicle and at some point stated he was unable to exit.  The officers observed the passenger had crutches.[6]  The left rear passenger, a female, also did not heed the officer's instructions to exit the vehicle.  (Pl.'s SUF ¶ 18; Def.'s Resp. ¶ 18; Def.'s SUF ¶¶ 50–52; Pl.'s, Resp. ¶¶ 51–52.)

The officers approached the vehicle with their guns drawn.  Green was lying across the backseat with his head on or near the lap of the female passenger.  The officers confirmed that Green had been shot in the abdomen.  Some officers, upon initially looking into the vehicle after they approached, pointed their firearms into vehicle.  (Pl.'s SUF ¶ 19; Def.'s Resp. ¶ 19; Def.'s SUF ¶ 56; Def.'s Resp. ¶ 56; Gaddis' Patrol Car On-Board Video, ECF No. 28, Ex. F.)

The officers then cleared fire department medical personnel, who were staged behind the

---

[6] Plaintiffs state this passenger was partially paralyzed and could not get out of the car by himself, and that the passenger informed the officers of this.  (Pl.'s SUF, ¶ 18.)

patrol vehicles, to enter the scene.  By that point, the officers had visually confirmed there were no weapons and that someone was gravely injured in the vehicle.  (Pl.'s SUF ¶¶ 21, 23; Def.'s Resp. ¶¶ 21, 23.)

The paramedics entered the scene within ten seconds of the officers clearing them to enter. Upon initial contact with Green, the paramedics observed Green with no pulse; he was not breathing; his pupils were fixed and dilated.  Green was transferred to an ambulance, which left for Mercy San Juan Hospital.  Green was not removed from the vehicle at gunpoint.  (Def.'s SUF ¶¶ 60, 69–72; Pl.'s Resp. ¶¶ 60, 69–72; ECF No. 28, Ex. F.)

The officers did not at any point ask any of the occupants of the vehicle whether they were armed.  The officers did not at any point observe the occupants of the vehicle make furtive gestures or appear to conceal anything.  (Pl.'s SUF ¶¶ 36, 38; Def.'s Resp. ¶¶ 36, 38.)

The vehicle pulled over and stopped at about 3:12:20 AM.  Paramedics were cleared to enter at about 3:16:18 AM.  The paramedics transferred Green to an ambulance, which left at about 3:22:34 AM.  (Pl.'s SUF ¶¶ 22, 24; Def.'s Resp. ¶¶ 22, 24.)  Green was eventually pronounced dead at the hospital.

B. Disputed Material Facts

i.     The vehicle stop

It is disputed whether the driver, upon exiting the vehicle during the felony stop, "immediately" informed officers that an occupant of the vehicle had been shot.  (Pl.'s SUF ¶ 16, Def.'s Resp. ¶ 16.)

It is disputed whether any of the officers was a trained medical professional and whether any of the officers provided professional medical care to Green.  Plaintiffs state non-party Officer Johashen was trained in basic first aid, identified the location of Green's wound, and applied pressure to the wound.  (Def.'s SUF ¶ 35; Pl.'s Resp. ¶ 35.)

It is disputed whether the occupants of the vehicle knew they were driving toward the nearest hospital, Mercy San Juan.  (Pl.'s SUF ¶ 10; Def.'s Resp. ¶ 10.)

Of most relevance:  It is disputed to what extent the officers, in deciding to conduct the stop as they did, relied upon the initial radio dispatch saying that an "intruder" had been shot.  It

is disputed to what extent the officers thought the victim, Green, had committed a crime.  It is disputed to what extent, and/or at what point, the officers were certain that the reporting person was the shooter; knew that the shooter and the firearm were secured at the Citrus Heights residence; knew that there was one victim in the vehicle; and knew that the other occupants were not armed or dangerous.  (Pl.'s SUF ¶¶ 25–31; Def.'s Resp. ¶¶ 25–31.)

*ii.*     *Expert reports*

Defendants submit an expert report from Dr. M. Vilke, which states in summary:  1) the type of arterial injury suffered by Green was catastrophic; 2) the use of cocaine contributed to the rapidity of the cardiac arrest and death of Green; 3) if Defendant Officers had intervened, they would not have been able to stop the bleeding; 4) even if paramedics did not have to stage until scene safety was secured, or if the officers never stopped the car that Green was being transported in, Green would still have died; and 5) the type of injury suffered by Green, though a potentially survivable injury under only the most optimal situation, was a "terminal event" under the circumstances.  (ECF No. 28-8 at 3.)

Plaintiffs submit an expert report and a rebuttal from Dr. Werner Spitz.  In summary, those reports state: 1) had Green been taken to the hospital and operated on without delay by police, he had either a "more likely than not chance of survival" or an "excellent" chance of survival; 2) Green "experienced conscious pain and suffering and the fear of impending doom until he lost consciousness from blood loss caused by hypovolemic shock"; 3) no cocaine was found in Green's blood; 4) the "optimal situation" referenced by Dr. Vilke was available and feasible if the police escorted the vehicle to the hospital.  (ECF Nos. 28-7 at 4–6; Nos. 28-9 at 1–3.)

## II.     PROCEDURAL HISTORY

The initial complaint was filed on May 13, 2013.  (ECF No. 1.)  The FAC was filed on December 10, 2013.  (ECF No. 16.)  Plaintiffs moved for summary judgment on December 16, 2014.  (ECF No. 27.)  Defendants moved for summary judgment on December 17, 2014.  (ECF No. 29.)  Both parties filed oppositions to each other's motions on January 8, 2015.  (ECF Nos. 32, 33.)  Both parties filed replies on January 22, 2015.  (ECF Nos. 34, 35.)  On the Court's own

1  motion, the matter was submitted without oral argument on February 6, 2015.  (ECF No. 36.)

2          The FAC states the following causes of action:

3      • Claim 1: Survival Action under § 1983 (County and Defendant Officers)

4      • Claim 2: Wrongful Death under § 1983 (County and Defendant Officers)

5      • Claim 3: Violations of Plaintiff's Rights to Familial Relationship and *Monell*

6          violations, under § 1983 (County and Defendant Officers)

7      • Claim 4: Wrongful Death - Negligence under C.C.P. §§ 377.60 and 377.61 (County,

8          Defendant Officers, Henderson)

9      • Claim 5: Violations of Civil Code § 52.1 (County and Defendant Officers)

10     • Claim 6: Violation of California Civil Code § 51.7 (County, Defendant Officers,

11         Henderson)

12     • Claim 7: Intentional Infliction of Emotional Distress (County, Defendant Officers,

13         Henderson)[7]

14     • Claim 8: Assault and Battery (Henderson)

15  **III.      STANDARD OF LAW: SUMMARY JUDGMENT**

16          Summary judgment is appropriate when the moving party demonstrates no genuine

17  dispute exists as to any material fact, and that the moving party is entitled to judgment as a matter

18  of law.  Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970).  Under

19  summary judgment practice, the moving party always bears the initial responsibility of informing

20  the district court of the basis of its motion and identifying those portions of "the pleadings,

21  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

22  any," that it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*

23  *v. Catrett,* 477 U.S. 317, 322 (1986).  "[W]here the nonmoving party will bear the burden of

24  proof at trial on a dispositive issue, a summary judgment motion may properly be made in

25  reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on

26  file.'"  *Id.* at 324.  Summary judgment should be entered against a party who does not make a

27  showing sufficient to establish the existence of an element essential to that party's case, and on

28  _____

[7] Plaintiffs voluntarily withdraw this seventh cause of action.  (ECF No. 33 at 17, n. 6.)

1   which that party will bear the burden of proof at trial.  *Id.* at 322.

2        If the moving party meets its initial burden, the burden then shifts to the opposing party to

3   establish the existence of a genuine dispute as to any material fact.  *Matsushita Elec. Indus. Co. v.*

4   *Zenith Radio Corp.,* 475 U.S. 574, 585–87 (1986); *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S.

5   253, 288–89 (1968).  In attempting to establish the existence of this factual dispute, the opposing

6   party may not rely upon the denials of its pleadings, but is instead required to proffer evidence of

7   specific facts in the form of affidavits, or other admissible evidence, in support of its contention

8   that the dispute exists. Fed. R. Civ. P. 56(c).  The opposing party must demonstrate that the fact in

9   contention is material, i.e., a fact that might affect the outcome of the suit under the governing

10  law, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986), and that the dispute is genuine,

11  i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, *id.*

12  at 251–52.

13       To establish the existence of a factual dispute, the opposing party need not establish a

14  material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be

15  shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."

16  *First Nat'l Bank,* 391 U.S. at 289.  Thus, the "purpose of summary judgment is to 'pierce the

17  pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

18  *Matsushita,* 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963

19  amendments).

20       In resolving the summary judgment motion, the court examines the pleadings, depositions,

21  answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ.

22  P. 56(c); *SEC v. Seaboard Corp.,* 677 F.2d 1301, 1305–06 (9th Cir. 1982).  The evidence of the

23  opposing party is to be believed, and all reasonable inferences that may be drawn from the facts

24  placed before the court must be drawn in favor of the opposing party.  *Anderson,* 477 U.S. at 255.

25  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

26  produce a factual predicate from which the inference may be drawn.  *Richards v. Nielsen Freight*

27  *Lines,* 602 F.Supp. 1224, 1244–45 (E.D.Cal.1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987).

28       Finally, to demonstrate a genuine dispute of material fact that necessitates a trial, the

8

opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita,* 475 U.S. at 586–87.

## IV.    ANALYSIS

A.  <u>Submitted Evidence</u>

In part, the submitted evidence includes:

- Excerpts from the deposition testimony of each Defendant Officer.  (ECF No. 28, Ex.'s B, C, D, and E.)

- Excerpt from the deposition testimony of non-party Officer Garvin Johashen.  (ECF No. 32, Ex. 5.)

- Excerpt from the deposition testimony of the driver of the vehicle, William Taff Davis.  (ECF No. 32, Ex. 7.)

- The patrol car on-board video of Defendant Gaddis, which shows the entirety of the felony stop from a view behind the vehicle, from the time the vehicle pulled over to when the ambulance departed with Green inside.  (ECF No. 28, Ex. F.)

- The patrol car on-board video of non-party Officer Harrington, which shows Harrington pulling up to the Citrus Heights residence a few seconds before the vehicle pulls away with Green inside.  (ECF No. 28, Ex. F.)

- Expert medical reports from Plaintiff and Defendants.  (ECF No. 28, Ex.'s G, H, and I.)

- A printout of the relevant SSD Computer-Aided Dispatch (CAD) communications.  (ECF No. 32, Ex. 8.)

- A transcript of SSD radio communications relevant to the events in question, and the audio recording of those communications.  (ECF No. 32, Ex. 12; ECF No. 28, Ex. F.)

- The SSD General Order describing Code 3 and vehicle pursuit guidelines for patrol cars.  (ECF No. 32, Ex. 9.)

- The Patient Care Report from Sacramento Metropolitan Fire Service.  (ECF No. 32, Ex. 11.)

1    B. Qualified Immunity

2         Both parties move for summary judgment on the issue of whether Defendant Officers are

3    entitled to qualified immunity, with respect to Plaintiffs claims under the Fourth and Fourteenth

4    Amendments and 42 U.S.C. § 1983. This – including an analysis of whether a constitutional right

5    was violated – is the central issue in the parties' motions.

6         Qualified immunity protects government officers from "liability for civil damages insofar

7    as their conduct does not violate clearly established statutory or constitutional rights of which a

8    reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

9    "Because qualified immunity is 'an immunity from suit rather than a mere defense to liability ... it

10   is effectively lost if a case is erroneously permitted to go to trial.'" *Pearson v. Callahan*, 555

11   U.S. 223, 231 (2009) (citing *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985) (emphasis deleted)).

12   The Supreme Court has "repeatedly [] stressed the importance of resolving immunity questions at

13   the earliest possible stage in litigation." *Id.* at 232 (citing *Hunter v. Bryant*, 502 U.S. 224, 227

14   (1991)).

15        To determine whether an officer is entitled to qualified immunity, courts ask (1) whether

16   the alleged misconduct violated a right and (2) whether the right was "clearly established" at the

17   time of the alleged misconduct. *Id.* at 223–25.  The Court decides in its discretion whether to

18   address the first or second prong first.  However, if the Court initially addresses the first prong

19   and finds that no constitutional right was violated under the alleged facts, the inquiry ends and

20   defendants prevail. *Saucier v. Katz,* 533 U.S. 194, 201 (2001).

21        Further, "[a]n official sued in his individual capacity may prevail on a defensive summary

22   judgment motion by showing *either* the absence of a constitutional violation *or* that the right in

23   question was not clearly defined at the time of the violation; a *plaintiff* seeking summary

24   judgment on the same claim must prove *both* the constitutional violation *and* that the right was

25   clearly defined." *Morales v. City of Delano*, 852 F. Supp. 2d 1253, 1267 (E.D. Cal. 2012).  *See*

26   *also Mueller v. Auker,* 576 F.3d 979, 989 (9th Cir. 2009).

27        In resolving the question of qualified immunity on defendant's motion for summary

28   judgment, the court must view the facts in the light most favorable to the plaintiff, *Schwenk v.*

10

1    *Hartford,* 204 F.3d 1187, 1198 (9th Cir. 2009), and can only grant the motion if defendants

2    present evidence that would entitle them to a "directed verdict if the evidence went

3    uncontroverted at trial." *Houghton v. South,* 965 F.2d 1532, 1536 (9th Cir.1992).

4           The Court construes the FAC, in combination with Plaintiffs' motion for summary

5    judgment, to claim that Defendant Officers: 1) committed an unlawful seizure of Green in

6    violation of the Fourth Amendment; 2) used excessive force against Green in violation of the

7    Fourth Amendment; 3) delayed Green's access to medical care in violation of the Fourteenth

8    Amendment; 4) and failed to administer medical aid to Green in violation of the Fourth

9    Amendment.[8]

10          The Court turns directly to the issue of whether Green's Fourth and Fourteenth

11   Amendment rights were violated by the officers' conduct while ruling on the aforementioned four

12   claims.  The Court has carefully considered the evidence submitted by the parties, including

13   Defendant Gaddis' on-board camera footage of the felony stop, and the SSD radio

14   communications relevant to the stop.  The Court finds Defendant Officers committed no

15   constitutional violation, and therefore they are entitled to qualified immunity under 42 U.S.C. §

16   1983.

17       C.   Unlawful Seizure under the Fourth Amendment

18          Plaintiffs argue that Defendant Officers unreasonably seized Green by pulling over the

19   vehicle.  (ECF No. 27 at 20.)

20                       The Fourth Amendment's prohibition against unreasonable
                         searches and seizures applies to investigatory traffic stops.  To
21                       justify an investigative stop, a police officer must have reasonable
                         suspicion that a suspect is involved in criminal activity.  Reasonable
22                       suspicion is formed by specific articulable facts which, together
                         with objective and reasonable inferences, form the basis for
23                       suspecting that the particular person detained is engaged in criminal
                         activity … [Courts] look at the totality of the circumstances to see
24                       whether the officer had a particularized and objective basis for
                         suspecting criminal activity.  Officers are encouraged to draw upon
25

26   _____
     [8] Defendants object on various grounds as to whether Claims One and Two in the FAC should be brought as survival
27   or wrongful death actions.  Regardless of the outcome of these arguments, all federal claims in the FAC – One, Two,
     and Three – may proceed only if Defendants' motion for summary judgment is denied on the issue of whether
     Defendant Officers are entitled to qualified immunity and whether the County is liable for a *Monell* violation.  The
28   Court looks directly at whether Defendant Officers are entitled to qualified immunity and whether there is a *Monell*
     violation, and finds summary judgment should be granted to Defendants.

their own specialized training and experience in assessing the totality of the circumstances.

*U.S. v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002) (internal citations and quotation marks omitted).

Plaintiffs argue: "The Defendant [Officers] had no reasonable suspicion of illegal activity. To the contrary, the [Officers] were informed that the white Cadillac contained the victim of a shooting. Dispatch quickly cleared up any confusion that Jacob Green was a shooting suspect by clarifying that he was indeed the victim and [that the] shooter was still located at Karm Way with the firearm secured." (ECF No. 27 at 20–21.) Plaintiffs further argue that the description of Green as an "intruder", and the officers' reliance on this term, does not constitute a "specific articulable" fact justifying the stop. (ECF No. 27 at 21.)

However, it is undisputed that Defendant Officers were initially informed by radio dispatch that an "intruder" was shot and had left in a white Cadillac. The officers were then told that the "suspect" was in the vehicle, with reports thereafter stating either the "suspect" or the "victim" was in the vehicle. While in pursuit, the officers observed the vehicle driving at speeds between 60 to 85 m.p.h., when the posted speed limit was 45 m.p.h., and the vehicle ran red lights. The officers pursued the vehicle with lights and sirens activated for three-quarters of a mile to a mile before the car pulled over.

A vehicle detention is justified based on a traffic violation alone. *See Wren v. United States*, 517 U.S. 806 (1996) ("Detention of a motorist is reasonable where probable cause exists to believe that a traffic violation has occurred. [citation] Petitioners claim that, because the police may be tempted to use commonly occurring traffic violations as means of investigating violations of other laws, the Fourth Amendment test for traffic stops should be whether a reasonable officer would have stopped the car for the purpose of enforcing the traffic violation at issue. However, this Court's cases foreclose the argument that ulterior motives can invalidate police conduct justified on the basis of probable cause."). *See United States v. Valdes–Vega,* 738 F.3d 1074, 1078 (9th Cir. 2013) (quoting *United States v. Arvizu,* 534 U.S. 266, 274 (2002)) ("The reasonable-suspicion standard is not a particularly high threshold to reach. 'Although ... a mere hunch is insufficient to justify a stop, the likelihood of criminal activity need not rise to the level

1  required for probable cause, and it falls considerably short of satisfying a preponderance of the

2  evidence standard.'").

3      Plaintiffs cite *United States v. White*, 2014 WL 5522072, at *3 (N.D. Cal. Oct. 31, 2014),

4  for the proposition that "an officer's subjective motivations (or pretext for a stop) are nevertheless

5  relevant in assessing the credibility of an officer."  Plaintiff argues that credibility determinations

6  regarding their subjective motivations for stopping the vehicle are not properly determined on a

7  motion for summary judgment.  (ECF No. 33 at 14.)  However, it is undisputed that the officers

8  witnessed the vehicle commit traffic violations, and that the officers initially received reports that

9  a "suspect" and an "intruder" involved in a shooting, was in the vehicle.  Based on these facts, the

10  Court finds Defendant Officers had a reasonable suspicion to detain the vehicle.[9]

11      To the extent Plaintiffs argue that Green's Fourth Amendment rights were violated by the

12  manner in which the stop was conducted – a felony stop – this argument is addressed immediately

13  below.

14    D.  Excessive Force under the Fourth Amendment

15      Plaintiffs argue that Defendant Officers used excessive force in conducting the stop.

16  (ECF No. 33 at 7–9.)

17
>       Determining whether the force used to effect a particular seizure is
18      reasonable under the Fourth Amendment requires a careful
>       balancing of the nature and quality of the intrusion on the
19      individual's Fourth Amendment interests against the countervailing
>       governmental interests at stake … The reasonableness of a
20      particular use of force must be judged from the perspective of a
>       reasonable officer on the scene, rather than with the 20/20 vision of
21      hindsight … The calculus of reasonableness must embody
>       allowance for the fact that police officers are often forced to make
22      split-second judgments – in circumstances that are tense, uncertain,
>       and rapidly evolving – about the amount of force that is necessary
23      in a particular situation … [T]he reasonableness inquiry in an
>       excessive force case is an objective one: the question is whether the
24      officers' actions are objectively reasonable in light of the facts and
>       circumstances confronting them, without regard to their underlying
25      intent or motivation.

*Graham v. Connor*, 490 U.S. 386, 396–97 (1989) (internal citations and quotation marks
26
omitted).
27

28  ---
[9] However, see discussion below regarding the difference between non-party Officer Harrington's response and
Defendant Officers' response.

13

1        It is undisputed that Defendant officers were informed by radio dispatch that an "intruder"

2   was shot and had left in a white Cadillac.  The officers were initially told that the "suspect" was

3   in the vehicle, with reports thereafter stating either the "suspect" or the "victim" was in the

4   vehicle.  While in pursuit, Defendant officers observed the vehicle committing traffic violations.

5   After the vehicle pulled over, officers ordered the driver and then the front passenger to step out

6   of the vehicle and walk backwards toward the officers with their hands raised.  The driver and the

7   front passenger were handcuffed.  The left and right rear passengers did not exit the vehicle as

8   directed.  At that point, the officers approached the vehicle with their guns drawn, and confirmed

9   that Green was wounded in the back seat.  Some officers pointed their weapons into the vehicle

10  upon looking into it after they approached.  However, Green was not removed from the vehicle at

11  gunpoint.

12       It is undisputed that the officers did not at any point ask any of the occupants of the

13  vehicle whether they were armed.  The officers did not at any point observe the occupants of the

14  vehicle make furtive gestures or appear to conceal anything.  Once the vehicle was pulled over,

15  none of the occupants attempted to flee.

16       Plaintiffs cite numerous cases for the proposition that drawing weapons and using

17  handcuffs or other restraints is unreasonable in situations such as the instant case.  *See e.g.*

18  *Robinson v. Solano County*, 278 F.3d 1007, 1013 (9th Cir. 2012) (recognizing that a drawn gun

19  may effect a seizure if it creates a "restraint of liberty such that the person reasonably believe that

20  he is not free to leave"); *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996) ("Under

21  ordinary circumstances, when the police have only reasonable suspicion to make an investigatory

22  stop, drawing weapons and using handcuffs and other restraints will violate the Fourth

23  Amendment"); *John v. City of Bellevue*, 2006 WL 223797, at *5 (W.D. Wash. Jan. 30, 2006)

24  (noting that cases in which drawn guns have been held to constitute excessive force "involved

25  facts upon which a court found that there were no apparent dangerous or exigent circumstances at

26  the time the weapons were used").

27       However, dangerous or exigent circumstances were apparent in this case.  Defendant

28  officers had only general information as to who was in the vehicle.  The specific information they

had included that a possible suspect in a home invasion was in the vehicle.  It was shortly after 3:00 AM, in an area associated with significant gang activity.  Paramedics had also staged behind the officers, to enter the scene upon the officer's determination that it was secure.  It is clear that Defendant officers could not be certain what might occur when they pulled over the vehicle, when they ordered passengers out of the vehicle, and when they approached the vehicle.

For example, Officer Flick testified at his deposition:

> A: I understood an intruder had been shot and the shot person was in the car.  I don't know if there was one intruder or two intruders or three intruders at this point.  All I have is an intruder has been shot.
>
> …
>
> Q:  … And at this point in time, do you recall what information you had pertaining to the white vehicle, the white Cadillac, anyone in particular, anyone outside it being injured?
>
> A:   Same information we previously discussed.   White vehicle described as the victim leaving in it, suspect leaving in it, intruder leaving in it was the basic information.
>
> Q:  Was it in your mind that whether the word victim, suspect or intruder was used, it was all the person who was shot?
>
> A:  Yes, sir.
>
> Q:  Okay.  So at the time you pull up here, you're of the belief that the person who has been shot is in the white Cadillac?
>
> A: Yes, sir.

(ECF No. 28, Ex. E at 10–12.)

Officer Pai testified at his deposition:

> Q:  You received some information from dispatch that would tend to show that the person had not committed a felony, correct?
>
> A:   I didn't have enough [information] back at the time to determine what crime, if any, had occurred.   I had reasonable suspicions to stop the vehicle just based upon my observation of it driving at a high rate of speed.  I also had additional information that the vehicle was leaving the scene of a shooting.  Those are the investigative steps I took to establish my reasonable suspicion to stop the vehicle.

(ECF No. 28, Ex. D at  36.)

Officer Gaddis testified at his deposition:

15

Q: … And why did you initiate the stop?

A: Because there was some confusion whether the suspect or the victim was inside the vehicle.

…

Q: …As I understand it, you conducted a high-risk felony vehicle stop?

A: Yes.

Q: What is entailed in conducting a high-risk felony vehicle stop?

A: Where this is possible weapons, where there's a high risk of being injured, a high risk of – you know, we don't know who the suspects were, and we don't know if they had warrants, or if they had guns on them still, or something that's going to possibly injure officers.

(ECF No. 28, Ex. C at 6, 8–9.)

The Court notes non-party Officer Harrington's response upon initially arriving at the scene of the shooting and seeing the vehicle about to take off.[10] When he arrived at the scene of the shooting, Harrington yelled "an ambulance is coming" at the occupants in the vehicle, and appears to attempt to get the vehicle to remain at the scene. Unknown individuals off to the side yelled at the vehicle to drive away. About 15 seconds after Harrington arrived, the vehicle left the scene, and Officer Harrington returned to his vehicle but did not pursue the vehicle. Officer Harrington reported over the SSD radio, after the vehicle had left, that "The white Cadillac is GOA. As I pulled up, they were leaving with the sus – or the victim inside."

Although Harrington's response acknowledged that the "victim" was in the vehicle, Defendant Officers' deposition testimony is consistent with the SSD radio communications, which stated at various points that an "intruder" and "suspect" and "victim" were in the vehicle. In fact, in his response, even Harrington started to say that the suspect was in the vehicle as he stated, " … As I pulled up, they were leaving with the sus – or the victim …" For the reasons stated above, it is clear that Defendant Officers who pulled over the vehicle, who were not at the scene of the shooting, had reason to think there was a threat to officer safety. Therefore, the Court finds the manner in which Defendant Officers conducted the felony stop – which the Court

---

[10] Plaintiffs do not highlight this difference.

16

1   has viewed via Officer Gaddis' on-board camera footage a number of times – objectively

2   reasonable in light of the facts and circumstances confronting them.  *Graham v. Connor*, 490 U.S.

3   at 397.  Therefore, the Court finds there is no constitutional violation based on excessive force

4   grounds.

5       E.   Delay of Medical Care under the Fourteenth Amendment

6           Plaintiffs "claim that Defendant Deputies violated Decedent Jacob Green's Fourteenth

7   Amendment right to due process by delaying his access to medical care and thus ensuring his

8   death."  (ECF No. 27 at 16.)

9           Defendants argue that "the critical question in determining the appropriate standard of

10  culpability is whether the circumstances allowed the state actors to fully consider the potential

11  consequences of their conduct."  *Moreland v. Las Vegas Metro. Police Dep.'t*, 159 F.3d 365, 373

12  (9th Cir. 1998).  Defendants argue that Plaintiffs are required to show the officers acted with a

13  "purpose to harm" unrelated to legitimate law enforcement objectives, because the officers were

14  within a "fast paced, evolving situation presenting competing obligations with insufficient time

15  for the kind of actual deliberation required for deliberate indifference."  *Porter v. Osborn*, 546

16  F.3d 1131, 1142 (9th Cir. 2008).  Defendants argue that all law enforcement high-speed chases

17  are emergency situations that require the "purpose to harm" standard under the Fourteenth

18  Amendment.  *Bingue v. Prunchak*, 512 F.3d 1169, 1178 (9th Cir. 2008).[11]

19          The Court notes that both *Moreland* and *Porter* involved the fatal shooting of an

20  individual by police officers, while *Bingue* involved a high speed chase in which the driver and

21  passenger of another vehicle were struck by one of the police vehicles giving chase.  However,

22  the circumstances present here are not analogous to those in *Moreland*, *Porter*, or *Bingue*.  In

23  large part, the death of Green is alleged to be the result of Green being shot by Defendant

24  Henderson, officers conducting a lengthy felony stop once the vehicle was pulled over, a delay in

25  permitting paramedics to enter the scene, and a delay in transporting Green to the hospital

26  _____

[11] Defendants also argue Plaintiffs do not have standing to bring a Fourteenth Amendment claim because there is no
27  Fourteenth Amendment right to rescue services, and that Plaintiffs cannot bring a Fourteenth Amendment claim
    because a claim for excessive force and unlawful detention must proceed under the Fourth Amendment.  However,
    Plaintiffs clearly make an argument in the vein of *Maxwell*, *infra*, which permitted a Fourteenth Amendment claim
28  on the basis of impeding access to medical care.

1   resulting from the decision to pull the vehicle over.  Based on the facts and circumstances of the

2   instant case, the police vehicle pursuit itself is not the sole or even the primary source of the

3   alleged § 1983 injury.

4          A more analogous case is cited by Plaintiffs, *Maxwell v. County of San Diego*, 708 F.3d

5   1075 (9th Cir. 2013).  *Maxwell* considered a claim brought under the Fourteenth Amendment,

6   against police officers who allegedly delayed an ambulance in order to investigate a crime,

7   resulting in the death of a victim shot by her husband.  The *Maxwell* court rejected the contention

8   that the "purpose to harm" standard was consistent with using a "deliberate indifference"

9   standard, and thus did not use the "purpose to harm" standard.  *Id.* at 1083.

10          As stated in *Maxwell*, the due process clause of the Fourteenth Amendment guarantees the

11   right to bodily security, which here was allegedly violated by the delay in Green's arrival at the

12   hospital.  *Id.* at 1082.  Normally Defendant Officers could not be held liable under § 1983 for an

13   injury inflicted by a third party, or in this case, the shooter, Defendant Henderson.  *Id.* at 1082.

14   However, there are two exceptions to this rule: the "special relationship exception" and the

15   "danger creation" exception.  *Id.*  Plaintiffs claim only that the danger creation exception applies

16   in this case.

17          The danger creation exception applies where government officers affirmatively place the

18   victim in a position of danger.  *Id.*  Officers affirmatively place a person in danger by leaving him

19   in a situation that is more dangerous than the one in which they found him.  *Id.*  Impeding access

20   to medical care amounts to leaving a victim in a more dangerous situation.  *Id.*

21          In support of their position, Plaintiffs argue the facts as follows:  Defendant Officers

22   prevented the vehicle from reaching its intended destination, the hospital.  The officers knew that

23   the shooting victim was in the vehicle at the time they pulled it over.  The officers knew the

24   shooter and the firearm used in the shooting were not in the vehicle.  The officers delayed the

25   paramedics from administering medical aid to Green by having the paramedics stage behind their

26   patrol vehicles as the officers conducted a felony stop.  The officers showed a lack of urgency in

27   attending to Green and/or ensuring his transfer to the hospital.  Thus, the officers impeded

28   Green's access to medical care, possibly contributing to his death.  (ECF No. 27 at 17–18.)

18

1      Defendant Officers argue: Plaintiffs increased the risk to Green when they decided to take
2   him from the scene of the shooting to which paramedics had been summoned.  The officers, by
3   first conducting a felony stop prior to attending to Green, were acting to protect themselves and
4   paramedics.  The officers lacked a specific knowledge of who was in the vehicle and what
5   situation would confront them when they pulled the vehicle over.  Their actions ultimately led to
6   Green being transported in an ambulance to the hospital.  Thus, the officers did not place Green in
7   a more dangerous situation by delaying his access to medical care.  (ECF No. 32 at 7–10; ECF
8   No. 29-1 at 14–16.)

9      To assist in the analysis, the Court notes the timeline in the *Maxwell* case.  In *Maxwell*, a
10   man shot his wife, Kristin, in the jaw with a pistol, at approximately 10:50 PM.  Kristin was able
11   to call 9-1-1, and an officer was dispatched to the scene and arrived at about 10:53 PM.  At about
12   11:00 PM, other officers and a fire truck arrived at the residence.  Those responders determined
13   that Kristin had to go to a trauma center quickly and requested an air ambulance.  The responders
14   were informed that air ambulance would arrive in 25 minutes at a landing zone 10 minutes away.
15   At about 11:08 PM an ambulance arrived.  At that time, Kristin's vital signs were within normal
16   limits.  Kristin was placed in the ambulance between 11:18 PM and 11:25 PM.  However, one of
17   the officers present refused to let the ambulance leave immediately because he viewed the area as
18   a crime scene and thought Kristin had to be interviewed.  As a result, the ambulance did not leave
19   until 11:30 PM.  The ambulance then took 11 minutes to get to the landing zone.  Kristin died en
20   route to the landing zone, due to blood loss from the gunshot wound.  *Maxwell*, 708 F.3d at 1080–
21   81.

22      In this case, based on Officer Harrington's patrol car dashboard camera, the vehicle left
23   the scene of the shooting at roughly 3:10:25 AM.  After Defendant Officers initiated a Code 3
24   pursuit, the vehicle pulled over and stopped at about 3:12:20 AM.  Medical personnel were
25   cleared to enter at about 3:16:18 AM.   The medical personnel transferred Green to an ambulance,
26   which left at about 3:22:34 AM.  (Pl.'s SUF ¶¶ 22, 24; Def.'s Resp. ¶¶ 22, 24.)  The brief delay in
27   this case, as compared to *Maxwell*, does not support Plaintiff's position that Defendant Officers
28   violated the Fourteenth Amendment by delaying Green's access to medical care.

The Court also notes that in *Maxwell* the Ninth Circuit used a "deliberate indifference" standard in declining to grant summary judgment to defendants on Fourteenth Amendment grounds, although an explicit discussion of this standard is not contained in the majority opinion.[12]   The Ninth Circuit has

> define[d] the contours of deliberate indifference in [*L.W. v. Grubbs*, 92 F.3d 894, 898–900 (9th Cir.1996) ].  Under *Grubbs*, the standard we apply is even higher than gross negligence—deliberate indifference requires a culpable mental state. *Id.* The state actor must "recognize[ ][an] unreasonable risk and actually intend[ ] to expose the plaintiff to such risks without regard to the consequences to the plaintiff."  *Id.* at 899 (internal quotation omitted). In other words, the defendant "knows that something *is* going to happen but ignores the risk and exposes [the plaintiff] to it." *Id.* at 900. The deliberate-indifference inquiry should go to the jury if any rational factfinder could find this requisite mental state. [Citation].

*Morales*, 852 F. Supp. 2d 1253 (E.D. Cal. 2012) (quoting *Patel v. Kent School Dist.*, 648 F.3d 965, 974 (9th Cir. 2011)).

Plaintiffs argue briefly that Defendant Officers had "the requisite mens rea" to be liable under the deliberate indifference standard.  (ECF No. 33 at 21–22.)  However again, the submitted evidence shows Defendant Officers were responding to ambiguous SSD radio reports stating that an "intruder" or "suspect" or "victim" were in the vehicle.  Simply put, when Defendant Officers made the decision to initiate a felony stop of the vehicle they had no specific knowledge of the number of people in the vehicle, the condition of Green or any other person in the vehicle, the status of any of the occupants relative to their involvement in the shooting, or whether any of the vehicle occupants were armed with a deadly or dangerous weapon.  From the time the vehicle was pulled over, roughly four minutes passed until medical personnel were cleared to enter.  Roughly ten minutes passed from the time the vehicle was pulled over until the ambulance left the scene with Green for the hospital.  In sum, the undisputed facts of this case – including the video footage and the relevant radio communications – do not raise a triable issue as to whether Defendant Officers "recognized an unreasonable risk and actually intended to expose [Green] to such risks without regard to the consequences to [Green]."  *Grubbs*, 92 F.3d at 899

---

[12] A longer discussion of the deliberate indifference standard is contained in Judge Ikuta's dissent.

1 (citing *Uhlrig v. Harder*, 64 F.3d 567, 573, n. 8 (10th Cir. 1995)).

2    F.   Failure to Administer Medical Aid under the Fourth Amendment

3        Plaintiffs argue that Defendant Officers themselves did not give any aid to Green, thus

4 violating Green's rights under the 4th Amendment.[13]  (ECF No. 27 at 19.)

5        In support of this argument, Plaintiffs cite *Tatum v. City & Cty. of San Francisco*, 441

6 F.3d 1090, 1099 (9th Cir. 2006) (citing *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1415 (9th

7 Cir. 1986)), which held: "[d]ue process requires that police officers seek the necessary medical

8 attention for a detainee when he or she has been injured while being apprehended by either

9 promptly summoning the necessary medical help or by taking the injured detainee to a hospital."

10        The Court notes that the injury here occurred prior to the officers' involvement and not

11 while Green was being apprehended.  By contrast, in *Tatum*, defendant officers used an arm bar

12 to bring the decedent to the ground and handcuff him, and did not administer CPR although it

13 appeared he was having trouble breathing.  *Tatum*, 441 F.3d at 1093.  Plaintiffs also cite *City of

14 Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983), which is distinguishable since it too

15 involved injury to an individual that occurred while being apprehended by police.

16        Further, *Tatum* held: "a police officer who promptly summons the necessary medical

17 assistance has acted reasonably for purposes of the Fourth Amendment" even if the officer has

18 not given medical aid himself (in the case of *Tatum*, not giving CPR).  To restate the timeline:

19 based on Officer Harrington's on-board camera, the vehicle left the scene of the shooting at

20 roughly 3:10:25.  After Defendant Officers initiated a Code 3 pursuit, the vehicle pulled over and

21 stopped at about 3:12:20 AM.  Paramedics were cleared to enter at about 3:16:18 AM, which was

22 within ten seconds of the officers signaling that the area was secure.  The paramedics transferred

23 Green to an ambulance, which left at about 3:22:34 AM.  (Pl.'s SUF ¶¶ 22, 24; Def.'s Resp. ¶¶

24 22, 24.)  From the time the vehicle was pulled over, roughly four minutes passed until medical

25 personnel were cleared to enter.  Roughly ten minutes passed from the time the vehicle was

26 pulled over until the ambulance left the scene with Green for the hospital.  Based on this timeline,

27

28
_____

[13] Plaintiffs state non-party Officer Johashen was trained in basic first aid, identified the location of Green's wound, and applied pressure to the wound.  (Def.'s SUF ¶ 35, Pl.'s Resp. ¶ 35.)

1    the Court finds that the officers promptly summoned medical aid and thus acted reasonably for

2    purposes of the Fourth Amendment.

3        G. Clearly Established Right

4        The Court has considered whether a constitutional violation occurred based on each of the

5    four grounds stated above.  The Court does not find a constitutional violation occurred.  However,

6    assuming arguendo there is a question of fact as to whether a violation occurred, Defendants

7    argue that the second prong of analysis – whether the constitutional right was clearly established

8    – cannot be met.  Defendants argue "the law was not clearly established in April 2012 that

9    performing a felony vehicle stop for the safety of the public, the officers and the responding

10   medical professionals violates the rights of a suspect passenger because there are reports that the

11   suspect may be injured."  (ECF No. 29-1 at 17.)  On this point, Defendants reference only

12   *Morales v. City of Delano*, 852 F. Supp. 2d at 1271–73 (E.D. Cal. 2012), *supra*, which found no

13   Fourteenth Amendment violation where defendant officers decided to clear the scene of potential

14   dangerous persons for officer safety, prior to summoning medical care for a suspect who had been

15   shot by defendant officers.  Plaintiffs have not responded to this specific argument regarding

16   whether Green's rights were clearly established.  The Court agrees that the *Morales* decision and

17   the discussion cited therein supports Defendants' position that detaining Green and transferring

18   him to the hospital via ambulance, rather than permitting the vehicle to proceed unchecked to the

19   hospital (or some alternative to the manner in which the Officers dealt with the situation), does

20   not violate a clearly established right of which a reasonable officer should have known.

21   However, the Court declines to base its ruling on these grounds since the Court finds there was no

22   constitutional violation.

23       H. Qualified Immunity and Claims 1 – 3 in the FAC

24       For the foregoing reasons, as to Claims One, Two, and Three in the FAC, the Court

25   GRANTS Defendants' motion for summary judgment, and DENIES Plaintiffs' motion for

26   summary judgment, to the extent those motions are based on qualified immunity claims brought

27   under the Fourth and Fourteenth Amendments.

28   ///

I.   *Monell* Liability and Claims 1 – 3 in the FAC

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Monell v. Dep.'t of Social Servs.,* 436 U.S. 658, 694 (1978).  For example, a plaintiff may demonstrate a policy or custom of a municipality by showing one of the following:

> (1) a longstanding practice or custom which constitutes the standard operating procedure of the local government entity;
>
> (2) that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision; or
>
> (3) that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005) (citing *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984–85 (9th Cir. 2002)) (internal quotation marks and citations omitted).  "The custom must be so 'persistent and widespread' that it constitutes a permanent and well settled city policy."  *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (quoting *Monell*, 436 U.S. at 691).  "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy."  *Id.*

Defendants move for summary judgment on § 1983 claims brought against Sacramento County on the basis that Plaintiffs have not identified an unlawful policy or custom.  Plaintiffs do not appear to move for summary judgment on this issue.  In their opposition and FAC, they argue only that their *Monell* claims must go forward because Defendant Officers placed Green in danger by impeding his access to medical care in accordance with a custom, practice, and/or policy of Defendant County.  (ECF No. 33 at 22; ECF No. 16 ¶ 33.)  Plaintiffs do not establish that Defendant Officers inflicted an injury, but that aside, this single argument does not support a policy or custom on the part of Sacramento County that constitutes *Monell* liability.  For example, Plaintiffs do not identify other incidents involving a felony vehicle stop that impeded access to

1   medical care.  One issue Plaintiffs also do not raise relative to *Monell* liability is the SSD Code 3

2   protocol, i.e. the "guidelines pertaining to the Code-3 and pursuit operation of Sheriff's vehicles."

3   (ECF No. 32-6 at 2).  Code 3 "designates emergency assignments calling for all practical haste

4   and authorizes officers to operate the sheriff's vehicle with red light <u>and</u> siren activated."  (ECF

5   No. 32-6 at 2).  Those guidelines provide that "'Code-3 escort' … shall not be provided by

6   sheriff's vehicles.  Officers may transport an injured person to a hospital if the medical

7   emergency is of such gravity that there is no time to await the dispatch and arrival of an

8   ambulance."  (ECF No. 32-6 at 3).  However, Plaintiffs do not argue there is a characteristic of

9   Code 3 protocol, as set forth in the attached exhibit (ECF No. 32, Ex. 9), that forms the basis for

10  *Monell* liability.  Plaintiffs do not direct the Court to any authority that an SSD policy of

11  conducting a felony stop in this type of situation (where there is ambiguity regarding who is in the

12  vehicle following a shooting, and the vehicle has committed multiple traffic violations) was

13  unconstitutional.  Plaintiff's main argument is that the specific manner in which Defendant

14  Officers handled this situation, given these unique circumstances, violated Green's constitutional

15  rights.  Therefore, Defendants' motion for summary judgment as to claims brought against

16  Sacramento County under § 1983 – Claims One, Two, and Three in the FAC – is GRANTED.

17       J.   <u>FAC Claim 4: Wrongful Death via Negligence, Cal. Civ. Proc. Code §§ 377.60, 377.61</u>

18       Defendants move for summary judgment as to Claim 4 in the FAC, wrongful death due to

19  negligence by Defendant Henderson, Defendant Officers, and the County.

20       The FAC states that Defendants "were subject to a duty of care to avoid causing

21  unnecessary physical harm and distress to persons through their use of force and making of

22  arrests, and in providing medical care to Decedent, a shooting victim."  (ECF No. 16 ¶ 35.)

23  Plaintiffs argue that Defendants breached these duties.  (ECF No. 33 at 24–25.)

24       Defendants respond that: 1) there is no allegation or evidence to support a finding that the

25  officer arrested or personally provided medical care to Green; 2) the officers were under no duty

26  to provide medical care to an injury arising from the actions of a non-government officer

27  (Henderson); 3) even if found to have a duty to provide such care, it is undisputed that the officers

28  rerouted medical professionals to the location of the vehicle stop; and 4) there was no excessive

1    force and the officers did not cause injury to Green, who was found lying in the backseat with no

2    pulse and not breathing.  (ECF No. 29-1 at 20.)

3        "The elements of the cause of action for wrongful death are the tort (negligence or other

4    wrongful act), the resulting death, and the damages, consisting of the *pecuniary loss* suffered by

5    the *heirs*. [Citations.]".)  *Quiroz v. Seventh Ave. Ctr.*, 140 Cal. App. 4th 1256, 1263 (2006) (citing

6    5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 891, p. 350).  "[I]n order to prove facts

7    sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to

8    use due care, that he breached that duty, and that the breach was the proximate or legal cause of

9    the resulting injury."  *Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 292 (1988).  *See also Estate*

10   *of Prasad ex. Rel. Prasad v. County of Sutter*, 958 F. Supp. 2d 1101, 1118 (E.D. Cal. 2013); Cal.

11   Civ. Proc. Code §§ 377.60, 377.61 ("Persons with standing" and "Damages recoverable").

12       The Court will concede for the sake of argument that Defendant Officers have a duty to

13   avoid causing injury to Green and not to unnecessarily delay his access to medical care, which is

14   the primary argument in Plaintiffs' motion for summary judgment and FAC.  However, the Court

15   grants summary judgment to Defendant County and Defendant Officers because Defendant

16   Officers did not breach this duty and were not the proximate or legal cause of Green's death.  A

17   third-party, Defendant Henderson, committed the injury in this case.  The Court has found that

18   Defendant Officers had a reasonable suspicion to detain the vehicle and the manner in which they

19   conducted the stop was reasonable under the circumstances.  From the time the vehicle was

20   pulled over roughly four minutes passed until medical personnel were cleared to enter.  Roughly

21   ten minutes passed from the time the vehicle was pulled over until the ambulance left the scene

22   with Green for the hospital.  Further, it is not disputed that upon initial contact with Green, the

23   medical personnel observed Green with no pulse, he was not breathing, and his pupils were fixed

24   and dilated.  Neither party elaborates on the difference of opinion in the expert medical reports.

25   Defendants' expert report does appear to offer more details.  Regardless, given the specific

26   circumstance of the instant case, Plaintiffs fail to identify any California authority[14] suggesting

27

28
[14] In their Opposition, the California cases cited by Plaintiffs are *Quroz*, *supra*, and *Gilmore v. Superior Court*, 230 Cal. App. 3d 416, 420 (1991).

1    that a specific duty was breached by Defendant Officers or that the proximate cause of Green's

2    injury was Defendant Officers.  Therefore, Defendants' motion for summary judgment as to the

3    FAC, Claim 4, is GRANTED.

4        K.  FAC Claim 5: Violation of Cal. Civ. Code § 52.1

5        Defendants move for summary judgment as to Claim 5 in the FAC, alleging a violation of

6    Cal. Civ. Code § 52.1 against the County and Defendant Officers.

7        Section 52.1 of the California Civil Code authorizes individual civil actions for damages

8    and injunctive relief by individuals whose federal or state rights have been interfered with by

9    threats, intimidation, or coercion.  Cal. Civ. Code § 52.1(a) and (b).  *See also Johnson v. Shasta*

10   *Cty.*, 83 F. Supp. 3d 918, 934 (E.D. Cal. 2015).

11       The FAC states that Defendant Officers impeded Green's access to medical care and

12   violated other civil rights, "all accomplished through force, threats, intimidation and coercion."

13   (ECF No. 16 ¶ 40.)  Defendants respond there is no evidence of force, threats, intimidation or

14   coercion, apart from the detainment of the vehicle and the felony stop.  Defendants also direct the

15   Court to *Lopez v. County of Tulare*, 2012 WL 33244 at *11 (E.D. Cal. 2012) (citing *Rodriguez v.*

16   *City of Fresno*, 2011 WL 1883195, at *13 (E.D. Cal. 2011)) ("[I]n order to maintain a claim

17   under the Bane Act, the coercive force applied against a plaintiff must result in an interference

18   with a separate constitutional or statutory right.  It is not sufficient that the right interfered with is

19   the right to be free of the force or threat of force that was applied.")

20       Because Plaintiffs do not allege force, threats, intimidation, or coercion apart from the

21   same allegations of unlawful seizure and excessive force that make up their Fourth Amendment

22   violations – and further because the Court has found the seizure and use of force were lawful

23   under the circumstances – Defendants' motion for summary judgment as to the FAC, Claim 5, is

24   GRANTED.

25       L.  FAC Claim 6: Violation of Cal. Civ. Code § 51.7

26       Defendants move for summary judgment as to Claim 6 in the FAC, alleging a violation of

27   Cal. Civ. Code § 51.7 against Henderson, the County and Defendant Officers.

28       Cal. Civ. Code § 51.7(a) provides: "[a]ll persons within the jurisdiction of this state have

the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property … on account of any characteristic [including race]."

The FAC states that all Defendants were motivated by racial prejudice against Green, an African American.  (ECF No. 16 ¶ 45.)  Defendants respond that there is no evidence of racial prejudice and that Defendant Officers did not commit an act of violence or intimidate Green by threats of violence.

The FAC, Plaintiffs' motion for summary judgment, and Plaintiffs' opposition do not direct the Court to any evidence that Defendant Officers acted in any manner due to the fact that Green was African America.  The Court has found that Defendants acted lawfully in conducting the vehicle detention and felony stop.  Plaintiffs do not identify other acts of violence or intimidation through threats of violence that were committed against Green by Defendant Officers.  Therefore, Defendants' motion for summary judgment as to the FAC, Claim 6, is GRANTED.

M.  Remaining State Law Claims against Defendant Henderson

Jurisdiction in this case is based on the presence of Plaintiffs' § 1983 claims, and the Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Under 28 U.S.C. § 1367(c)(3), a district court may decline to exercise jurisdiction over supplemental state law claims if "if the district court has dismissed all federal claims over which it has original jurisdiction."  Generally, "when federal claims are dismissed before trial ... pendant state claims should also be dismissed." *Religious Tech. Ctr. v. Wollersheim,* 971 F.2d 364, 367–68 (9th Cir. 1992).  "The Supreme Court has stated, and [the Ninth Circuit] ha[s] often repeated, that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims.'" *Acri v. Varian Associates, Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350, n.7 (1988)).  The factors to consider are "economy, convenience, fairness, and comity." *Id.* (citing *Allen v. City of Los Angeles*, 92 F.3d 842, 846).[15]

---

[15] The common authority for all of the aforementioned Ninth Circuit cases is *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966), which stated (citations omitted):

As is apparent from the above discussion, this Court has exercised supplemental jurisdiction over the state law claims against the County and Defendant Officers while granting their motion for summary judgment as to the FAC.  Because the parties already began to litigate these claims in this Court, the factors of economy, convenience, and fairness all weighed in favor of retaining jurisdiction.  The issues of "comity" involved in applying state law were minimal, and therefore the Court finds this factor is neutral.

Defendant Henderson has not yet made an appearance in this lawsuit.  This Court's heavy caseload and trial calendar, which is relevant to the convenience of the parties in resolving this matter in a timely way, weighs against exercising jurisdiction as to the claims against Defendant Henderson.  The Court anticipates that state court resolution of these issues would be faster than resolution in this Court.  It is more appropriate for a state court to handle issues of wrongful death, assault and battery, and violence due to race under Cal. Civ. Code § 51.7, brought under state law against Defendant Henderson.  Overall, the factors of comity, convenience, fairness, and economy weigh against this Court exercising jurisdiction.  For these reasons, the Court does not exercise jurisdiction over the state law claims against Defendant Henderson; they are DISMISSED.

## V.   CONCLUSION

For the foregoing reasons:

Defendant County of Sacramento and Defendant Officers Pai, Oliver, Gaddis, and Flick's motion for summary judgment is GRANTED, and Plaintiff's motion for summary judgment is DENIED.  Therefore, summary judgment is granted to the County and Defendant Officers as to the FAC, Claims 1 – 6.  Claim 7 in the FAC is voluntarily withdrawn by Plaintiffs.

---

It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right.  Its justification lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them.  Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.

- • The Court declines to take supplemental jurisdiction over the state law claims against Defendant Henderson (Claims 4, 6, and 8 in the FAC); they are DISMISSED.
- • The Clerk of the Court may close the case.

Dated: January 29, 2016

_____
Troy L. Nunley
United States District Judge